IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 10, 2022

**MARK BRIAN DOBSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2013-C-2464    Mark J. Fishburn, Judge**

_____

**No. M2021-00949-CCA-R3-PC**

_____

Petitioner, Mark Brian Dobson, appeals the denial of his post-conviction petition. Specifically, Petitioner alleges that trial counsel was ineffective for: failing to investigate the facts of the case or interview witnesses; failing to "prepare cross examination of State's proof;" failing to file pretrial motion to redact from jail phone calls statements made by Petitioner's mother referring to a gun; failing to "preserve a defense pursuant to *State v. White*, 382 S.W.3d 559 (Tenn. 2012);" failing to discuss mandatory consecutive sentencing with Petitioner; advising Petitioner to plead guilty "to a single count during the trial" and by failing to inform Petitioner of the consequences of his plea; failing to preserve issues for appeal; and failing to advise Petitioner to testify at trial in support of his claim of self-defense. Petitioner also claims that he is entitled to post-conviction relief due to the cumulative effect of the errors of counsel. Following our review of the entire record and the briefs of the parties, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JOHN W. CAMPBELL, SR., JJ., joined.

Timothy Carter, Nashville, Tennessee, for the appellant, Mark Brian Dobson.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Trial*

In July 2013, the Davidson County Grand Jury indicted Petitioner for the especially aggravated kidnapping with a deadly weapon of Laquitta Waters; four counts of especially aggravated kidnapping with a deadly weapon of Ms. Waters' four children, K.W., A.G., M.M., and M.W.; the aggravated burglary of Ms. Waters' home; employing a firearm during the commission of a dangerous felony; the domestic assault of K.W.; and the domestic assault of Ms. Waters. The indictment alleged that the domestic assault of Ms. Waters occurred on July 23, 2011, but that the remaining counts occurred on July 22, 2011. Before trial, Petitioner pled guilty to the domestic assault of Ms. Waters, a Class A misdemeanor.

The jury convicted Petitioner of the especially aggravated kidnapping of Ms. Waters, K.W., A.G., M.M., and M.W., Class A felonies; aggravated burglary, a Class C felony; and employing a firearm during the commission of a dangerous felony, a Class C felony. The jury found Petitioner not guilty of the domestic assault of K.W. Petitioner received an effective seventy-year sentence. This court affirmed Petitioner's convictions and sentencing on appeal. *State v. Mark Brian Dobson aka Mark B. Martin*, No. M2015-00818-CCA-R3-CD, 2016 WL 7212574, at *1 (Tenn. Crim. App. Dec. 13, 2016). The facts of this case as summarized on direct appeal are as follows:

> At trial on the remaining eight counts, Waters testified that she was thirty-four years old and had four children: two sons, K.W. and M.W., and two daughters, A.G. and M.M. Waters and the [Petitioner] had been dating "off and on" for four years at the time of the alleged offenses, and M.M. and M.W. were the [Petitioner]'s children. The [Petitioner] sometimes stayed at Waters' home and was sometimes violent with her. Waters said she previously had warrants issued for his arrest but did not pursue the charges because "I was just in love and just didn't come down here to show up at the time."
>
> Waters testified that in late June or early July 2011, she and her children moved into an apartment on Lemont Drive. Waters' name was on the lease, she paid the rent, and she did not give the [Petitioner] a key. The apartment had three bedrooms. K.W., who was eleven years old, slept in the first bedroom, and A.G. and M.M., who were nine and five years old, respectively, shared the second bedroom. Waters said that her bedroom was "the last room with the balcony in the back" but that she and M.W., who was just a couple of weeks old, slept in the second bedroom with A.G. and M.M. Waters and the

- 2 -

[Petitioner] were not "together" at that time, but Waters would see him when she took the children to his mother's house.

Waters testified that in the early morning hours of July 22, she and the four children were sleeping in the second bedroom. Waters and M.W. were in one twin bed, A.G. and M.M. were in a second twin bed, and K.W. was on the floor. Waters said that "the light come on" and that the [Petitioner] came into the bedroom. The [Petitioner] had a gun, put it to Waters' head, and accused her of trying to sell sex on Facebook. Waters said that she asked the [Petitioner] what he was talking about and that he "kept going on and on about 'log on Facebook,' and, you know, waving a gun around walking back and forth right there ... in between the beds and stuff." Waters got out of bed and told the [Petitioner] to leave. K.W. started to leave the bedroom, but the [Petitioner] pushed K.W., causing the boy to hit his knee on the end of the bed.

Waters testified that the [Petitioner] refused to leave, went into the living room, and pushed the couch in front of the apartment door. The [Petitioner] told Waters, "[A]in't nobody going nowhere.'" He then moved M.M. into the living room, lay on the couch, and put the gun beneath a pillow under his head. Waters and the three other children remained in the bedroom. Waters said that she could not go back to sleep and that the [Petitioner] checked on her several times during the night to make sure she was not trying to help the children escape.

Waters testified that she had locked the door to her apartment prior to the incident and that she did not know how the [Petitioner] got inside the apartment. The [Petitioner] took Waters' cellular telephone and car keys, and she was scared. She said the [Petitioner]'s gun was a black pistol and was "shaped like" a police officer's gun. Waters explained that she did not try to escape from the apartment because she was afraid the [Petitioner] would hear her and hurt her and the children. At daylight, Waters lied to the [Petitioner] by telling him that one of the children had an appointment at Centerstone, a community mental health care center. Waters also told the [Petitioner] that the police would come to the apartment if Waters did not "show up" for the appointment. The [Petitioner] allowed the children to get dressed, everyone got into Waters' car, and Waters drove to Centerstone.

Waters testified that she and the children went into Centerstone while the [Petitioner] waited in the car. Waters told a woman at the front desk about the [Petitioner] and told her to call the police. Five or ten minutes later, the [Petitioner] came into Centerstone, and the woman at the desk told him to

leave. Centerstone employees took Waters and the children into a secure area to wait for the police. The [Petitioner] left before the police arrived, and Waters did not see him again that day.

Waters testified that the following night, July 23, she was at a friend's house. She said she was sitting outside "listening to some music, drinking and dancing and stuff" and saw the [Petitioner] running on the sidewalk toward her. Waters ran around her car, and the [Petitioner] "leaped" over the hood and grabbed her. She said he "slung" her onto the ground, "stomp[ed]" on her face, and ran away. Waters flagged down a police officer and told him what had happened. She said she had a "busted" blood vessel in her eye and a "busted" lip, and she identified photographs of her injuries for the jury. During the next month, the [Petitioner] continued to contact Waters. On August 29, the [Petitioner] demanded to see M.W. Waters let the [Petitioner] into her apartment to see the baby, but he refused to leave. The next day, Waters made up an excuse to leave the apartment and telephoned the police. The police came to the apartment and arrested the [Petitioner]. After the arrest, the [Petitioner] continued to contact Waters. The [Petitioner] telephoned her from jail, and she accepted his calls. She said that she told him to stop calling but that he continued to do so. Waters finally stopped accepting the [Petitioner]'s calls in 2012.

Waters testified that the [Petitioner] sent her letters from jail, and she identified letters written by him for the jury. In a letter dated October 19, 2011, the [Petitioner] apologized to Waters for "fighting on" her and asked that she forgive him for "all the wrong and pain" he had caused. In a letter dated October 20, 2011, the [Petitioner] threatened to harm "that [N***a] you with." In a letter dated December 9, 2011, the [Petitioner] stated that he would not allow Waters to be with another man and threatened to kill "that [n***er] before I let him have my soulmate." Waters said she was afraid the [Petitioner] would kill her too.

On cross-examination, Waters testified that the door of her apartment was not broken, and no windows were damaged. The door was dead-bolted on the night of July 22 and could only be opened from the inside by turning the lock or from the outside with a key. K.W. did not see a doctor for the injury to his knee, and Waters did not photograph the injury. Waters acknowledged that she was drinking alcohol on the night of July 23 and that she did not try to run into anyone's house to get away from the [Petitioner].

- 4 -

Waters acknowledged that she spoke with Detective Jason Osborne on the telephone on August 1, 2011, that he asked if she knew the [Petitioner]'s whereabouts, and that she told the officer no. She denied that the [Petitioner] was "standing right there" during her conversation with the officer. Sometime after the incident on July 22 but prior to the [Petitioner]'s arrest, Waters took the children swimming at a Red Roof Inn. The [Petitioner] was also present. A warrant had been issued for the [Petitioner]'s arrest, but Waters did not telephone the police. She denied that the [Petitioner] accompanied her to a pediatric appointment for M.W. when M.W. was two months old.

Waters acknowledged that a warrant had been issued for the [Petitioner]'s arrest when she let him into the apartment on August 29. She also acknowledged that the police did not find a gun on his person or in her apartment when they arrested him on August 30. Waters denied giving the [Petitioner] money or sending him cards while he was in jail. She identified an envelope, addressed to the [Petitioner] and with her return address, containing photographs of her children. Waters acknowledged taking the photographs but denied mailing them to the [Petitioner], stating that his mother may have sent them.

Waters testified that the [Petitioner] was present for the births of his children and that he signed M.M.'s birth certificate; however, he did not sign M.W.'s certificate. The [Petitioner] questioned M.W.'s paternity, so a DNA test was performed after the [Petitioner]'s arrest. The test showed that the [Petitioner] was M.W.'s father.

On redirect examination, Waters acknowledged that she called 911 on July 25 and July 28, 2011, trying to have the [Petitioner] arrested. On recross-examination, she acknowledged that every time she telephoned the police, she told them the [Petitioner] had a gun. However, the police did not find a firearm related to this case.

Thirteen-year-old K.W. testified that in July 2011, he was living with his mother, brother, and sisters on Lemont Drive and that the [Petitioner] did not live with them. One night, K.W. was asleep in his bedroom but heard a commotion in his sisters' bedroom. K.W. said that he went into the room, that the [Petitioner] "was like 'log into Facebook, log into Facebook right now,'" and that the [Petitioner] was pointing a gun at Waters' head. The gun was black and looked like a pistol. K.W. said that he did not know how the [Petitioner] got into the apartment but that "I think the window [was] broke in.'"

K.W. testified that he was scared and that he was "trying to go over there." However, the [Petitioner] pushed K.W. K.W. hit his ankle on the bed rail and started crying. Waters asked the [Petitioner] what he was talking about, but the [Petitioner] went into the living room and moved the couch in front of the door. At some point, the [Petitioner] told M.M. "to go lay down back where he was." During the night, the [Petitioner] checked the bedroom to make sure Waters and the other children were not trying to get out of the apartment.

K.W. testified that the next morning, his mother drove everyone to Centerstone. Waters and the children went inside, and Waters told someone at the front desk that "he got a gun, help us." K.W. said the [Petitioner] came in "like two minutes behind us." The [Petitioner] claimed that Waters was crazy and that he did not have a gun. A woman took Waters and the children to a back room, and the [Petitioner] "went off somewhere."

On cross-examination, K.W. acknowledged that the [Petitioner] helped the family move into the apartment on Lemont Drive. On the night of the altercation in the bedroom, K.W. heard Waters and the [Petitioner] yelling. K.W. went to the bedroom and saw that the light was on. Waters was lying in bed, and the [Petitioner] was standing near her. K.W. said that he "tried to stop it" and that the [Petitioner] pushed him. K.W.'s ankle hit the bed and was hurting but was not swollen or bruised. During the drive to Centerstone, K.W. did not see the [Petitioner] with a gun.

Julie Magin testified that on July 22, 2011, she was working at the front desk at Centerstone. An African-American woman with children came inside and said that a man was trying to kill her. The woman was "panicked" and told Magin to call 911. Magin said that she telephoned the police and that Centerstone staff moved the woman and children "behind locked doors." Shortly thereafter, an African-American man came into the facility. He did not say anything to Magin but lifted his hands and the front of his shirt to show that he did not have any weapons. Magin did not tell the man to leave, but he left the building immediately.

Melaton Bass-Shelton testified that she was the Clinic Manager for Centerstone. On July 22, 2011, a woman came into the facility and "made a statement that she was in fear for her life." The woman was "in a panicked state" and said that a man had held her at gunpoint. Bass-Shelton moved the woman and the woman's children to the other end of the building and had staff call 911. The police arrived and looked for the man but could not find him.

- 6 -

Officer Terry Richards of the Metropolitan Nashville Police Department (MNPD) testified that on July 22, 2011, she responded to a call involving a weapon at Centerstone. When she arrived, she interviewed Waters, and Waters told her the following: The [Petitioner] broke into Waters' home; held a gun to her head; and shoved her son to the floor, injuring his knee. The [Petitioner] then barricaded the door with a couch so that Waters and her children could not leave. Waters later lied to the [Petitioner] about having an appointment at Centerstone, and the [Petitioner] rode with them to the appointment. During the drive, the [Petitioner] held a gun to Waters' head and told her, "'I ought to kill you right now.'" When they arrived at Centerstone, Waters and the children went inside, and Waters asked the staff to call the police. The police arrived and looked for the [Petitioner] but could not find him.

Johnetta Gordon testified that she was Waters' cousin. She did not know the [Petitioner] but "[knew] of" him. On July 23, 2011, Gordon and Waters were at a cookout and were outside "listening to music, having a good time." Suddenly, Gordon saw the [Petitioner] "run out on [her] right side" and jump over the hood of a car. The [Petitioner] knocked Waters down and asked Gordon, "What [you] got to do with it[?]" Gordon felt threatened and answered, "[N]othing." She ran onto her aunt's porch. On cross-examination, Gordon acknowledged that she had a prior conviction for shoplifting.

Detective Clarence Thompson of the MNPD testified that on July 22, 2011, he interviewed Waters at the police department's Domestic Violence Division and that she told him the following: Waters woke to find the [Petitioner] standing over her with a gun, and he told her, "'I should kill you now.'" Waters gathered her children, and they all went into one room. The [Petitioner] put a couch or loveseat in front of the door and held Waters at gunpoint all night. That next morning, Waters told the [Petitioner] that one of the children had an appointment at Centerstone, so the [Petitioner] went with Waters and the children to the facility. During the drive, the [Petitioner] pointed the gun at her and told her, "'I should kill you in front of your kids.'" When they arrived at Centerstone, Waters and the children went inside, and Waters asked a woman to telephone the police. Waters turned around and saw the [Petitioner] enter the building. The staff ushered Waters and the children into a secured area, and the [Petitioner] left.

Detective Thompson testified that he tried to talk with K.W. but that the boy was "really quiet and withdrawn" and would not give him any information.

K.W. did say that the [Petitioner] pushed him and that K.W. hit his leg on a bed frame. Waters did not know how the [Petitioner] gained entry to her apartment, and Detective Thompson did not go to the home because there was no evidence to collect. Officers went to the [Petitioner]'s mother's house to arrest him but were told he did not live there. As part of Detective Thompson's investigation, he reviewed all of the previous reports Waters had filed against the [Petitioner]. Detective Thompson said that prior to this case, he had spoken with Waters three or four times.

On cross-examination, Detective Thompson acknowledged that he had spoken with Waters about the [Petitioner] previously. Defense counsel asked, "Did she usually say that Mr. Martin had a gun?" Detective Thompson answered, "Yes, she said that he was known to carry a gun." However, the officer never found a gun on the [Petitioner]'s person.

Thomas Devan Franklin, III, of the Davidson County Sheriff's Office (DCSO) testified that he was the custodian of records for telephone calls made by inmates at the Davidson County Jail. Franklin identified eight recorded calls made by the [Petitioner], and the State played the calls for the jury. The [Petitioner] made the first and third calls to his mother, and the remaining calls were to Waters. During the first call on September 6, 2011, the [Petitioner]'s mother asked him, "You knew this was going to happen.... What you expect with a stolen gun and all that, Mark?" The [Petitioner] told his mother that "I didn't kidnap them," and his mother replied, "You didn't let them go neither, did you?" During the call, the [Petitioner] asked his mother to place a three-way call to Waters. At first, the [Petitioner]'s mother refused; however, she ultimately called Waters for him. When Waters answered the telephone, the [Petitioner] asked her, "You really want to see me do fifteen years?" Waters said she could not talk to the [Petitioner] and hung up.

During the second call on September 23, 2011, Waters asked the [Petitioner] why he kept calling her. The [Petitioner] told Waters that he knew he "[f***ed] up" and "traumatized" her and that he was "so sorry." Waters told the [Petitioner] that she was glad to have her life back. In the third call on October 2, 2011, the [Petitioner]'s mother told him, "You ain't whooped nobody like you whooped [Waters]." In the fourth call on November 2, 2011, the [Petitioner] told Waters, "I wish I would have never put my hands on you like that." During the fifth call on November 5, 2011, Waters told the [Petitioner] that he moved the couch in front of the door, and the [Petitioner] told her that he did not remember doing so. He also told her that he loved and missed her. In the sixth call on November 11, 2011, the [Petitioner] again told

- 8 -

Waters that he loved her. In the seventh call on December 17, 2011, Waters told the [Petitioner] that she was happy because she did not have to worry about him "running up on [her] in the street." In the final call on December 30, 2011, Waters told the [Petitioner] to stop calling her and hung up.

Franklin testified that in the six months prior to trial, the [Petitioner] had called Waters' telephone number twenty-five to thirty times. However, none of the calls were answered.

After Franklin's testimony, the State rested its case-in-chief. Tom Davis of the DCSO testified that he was the records custodian for visitors to the jail. According to the [Petitioner]'s records, Waters was scheduled to visit him twenty-six times between September 12, 2011, and September 15, 2012. On cross-examination, Davis testified that the records showed Waters actually visited the [Petitioner] only twice: on October 31, 2011, and November 5, 2011. On redirect examination, Davis testified that the records indicated Waters came to the jail to visit the [Petitioner] ten additional times but that she was not "let in" to see him.

Jerrick Prime, the [Petitioner]'s cousin, testified that he helped the [Petitioner] move Waters into the apartment on Lemont Drive. The items Prime moved to the new apartment included the [Petitioner]'s belongings. The [Petitioner] had a key to the new apartment, and Waters did not appear to be afraid of him. The [Petitioner] cleaned the old apartment so that the $700 security deposit would be returned to him.

On cross-examination, Prime testified that when the [Petitioner] had money, "all was good." However, when the [Petitioner] did not have any money, Waters would "send him to jail." Prime stated that he did not look into any of the boxes or bags he moved to the new apartment and that "I know he had his stuff in there, but I don't know what was his and what was hers." He acknowledged that he was not present during the incidents on July 22 or 23.

The jury convicted the [Petitioner] as charged of especially aggravated kidnapping with a deadly weapon of Waters, K.W., A.G., M.M., and M.W., Class A felonies; aggravated burglary, a Class C felony; and employing a firearm during the commission of a dangerous felony, a Class C felony. The jury found the [Petitioner] not guilty of the domestic assault of K.W.

*Id*. at *1-6.

On direct appeal, Petitioner contended that

(1) the evidence is insufficient to support the convictions, (2) the trial court improperly denied his motion for a continuance, (3) the trial court erred by admitting into evidence a recorded telephone call in which his mother mentioned a stolen firearm, (4) the indictment for the charge of employing a firearm during the commission of a dangerous felony was defective for failing to name the underlying dangerous felony, (5) the trial court improperly instructed the jury on employing a firearm during the commission of a dangerous felony, and (6) his effective sentence is excessive.

*Id.* at *1. This court noted that in addition to the charges "for the nine offenses committed on July 22 and 23, 2011, the grand jury indicted [Petitioner] for two counts of domestic assault committed against Ms. Waters and K.W. on June 18, 2011. *Id.* at *9. However, those two counts were severed from the remaining counts before trial." *Id.* Petitioner claimed that his mother's statement on the jail phone call relating to the "stolen gun" concerned the June incident and that the statement should have been redacted. *Id.* At *8. On appeal, this court agreed but concluded that the error was harmless. *Id.* at *10. Ultimately, this court affirmed the judgments of the trial court but remanded the case to correct a clerical error on the domestic assault conviction and to correct the judgment as modified on the sentence for employing a firearm during the commission of a dangerous felony.

*Post-Conviction*

On March 16, 2017, Petitioner, acting pro se, filed a petition for post-conviction relief, contending that lead counsel and co-counsel were ineffective in numerous ways. The post-conviction court appointed an attorney, and an amended petition for post-conviction relief was filed, again alleging numerous instances of ineffective assistance of counsel. Thereafter, the post-conviction attorney withdrew from representation, and the post-conviction court appointed a new attorney. Another amended petition for post-conviction relief was filed, alleging yet additional instances of ineffective assistance of counsel.

At the post-conviction hearing, Petitioner's co-counsel testified that she was licensed to practice in March 2014. She recalled that at some point, lead counsel requested her assistance with the case. Co-counsel was not responsible for investigating any witnesses prior to trial, but she was responsible for cross-examining the son, K.W. Co-counsel noted that Petitioner was found not guilty on the count involving K.W.

Co-counsel said that prior to trial, she and lead counsel discussed the case in order to establish that she would handle the portion of the trial concerning K.W. Co-counsel adamantly told lead counsel that she would not handle any other portion of the case. On the morning trial was scheduled to begin, co-counsel thought the defense would be granted a continuance because lead counsel was "the fourth or fifth attorney" appointed to represent Petitioner, and lead counsel needed time to prepare for trial.

Co-counsel said that she was prepared for her portion of the trial but that from her conversations with lead counsel, she believed that he was not prepared because he was not granted the continuance he needed. Co-counsel said that when she and lead counsel showed up for court that morning lead counsel anticipated a continuance would be granted, she had her "folders and binders," but lead counsel did not. Additionally, Petitioner did not have clothes for trial. However, the request for continuance was denied, and trial began later that afternoon.

After the trial, lead counsel was relieved as counsel because Petitioner had filed a complaint about him with the Board of Professional Responsibility. Co-counsel took over the case and filed the motion for new trial. Co-counsel advised Petitioner that she did not intend to represent him on appeal because she did "not do appellate work." Co-counsel said that she had agreed to represent the Petitioner "for a very limited purpose" and that she "was not privy to a lot of the ins and outs of this matter." Co-counsel had not kept track of the "objections and appealable issues" during trial because she was only supposed to handle the issues regarding the son.

On cross-examination, co-counsel said that before court on the morning of trial, lead counsel assured co-counsel that they would not be proceeding to trial that day because the trial court had provided him assurances that they would get a continuance so lead counsel could prepare. Despite lead counsel's assurances, the case proceeded to trial that afternoon.

Co-counsel said that although she had not intended to handle the motion for new trial, she represented Petitioner on the motion because lead counsel had been relieved from representation at the conclusion of the sentencing hearing. Co-counsel said that she did not have much interaction with Petitioner and did not recall having any conversations with him regarding continuances. Co-counsel estimated that she was on the case for two or three months prior to trial.

Lead counsel testified that he was licensed to practice law in March 2014 and that he practiced criminal defense almost exclusively. Prior to being appointed to represent Petitioner, lead counsel had tried twenty or thirty criminal cases. Lead counsel had been appointed to the case sixty to ninety days before the trial began. Petitioner's previous

attorney had set a trial date, but after the trial court appointed lead counsel, the trial court granted a continuance of the trial date.

Lead counsel said that he requested another continuance on the day trial was scheduled to begin. He explained that a week prior to trial, he had been unable to contact any court officers to get some key defense witnesses subpoenaed. Although the trial court denied a continuance, the court "fashion[ed] a remedy for [lead counsel]," and the case proceeded to trial that afternoon.

Lead counsel said that he never received a settlement offer from the State. He explained, "When I was appointed, the State was ready to go." Lead counsel said that any settlement offers would have been made to Petitioner's previous attorneys.

Lead counsel thought he interviewed Dr. Mary Atubra and requested her records in connection with the case but could not specifically recall because nine years had elapsed since the time of trial. Lead counsel also interviewed Jerrick Prime[1], who he thought was Petitioner's cousin. Lead counsel said that Prime had helped Petitioner and Ms. Waters move belongings into Ms. Waters' apartment, and Prime knew that Petitioner had a key to the apartment. Lead counsel did not recall Steve Dobson or Todd Johnson as potential witnesses. Lead counsel said that Prime, Tom Davis, the custodian of records for the jail, and Issac Martinez, the keeper of the records for the police department's property room, were the witnesses he had wanted to subpoena if he had been granted a continuance. Regardless of the continuance being denied, lead counsel was able to subpoena the witnesses on the day trial began.

Lead counsel said that prior to trial, he looked at the jail phone records. Lead counsel said that he did not have an investigator working on the case. Lead counsel did not interview any of the State's witnesses prior to trial but reviewed "their written statements and just cross-examination." Lead counsel thoroughly investigated Ms. Waters' background.

Lead counsel said that after the trial court denied the continuance, the defense was able to find court clothes for the Petitioner from another courtroom because some courts keep clothes for people who are brought in wearing jail clothing.

Lead counsel said that he did not file any pretrial motions but that he relied upon the motions filed by prior counsel. Lead counsel visited Petitioner in jail two or three times and had visits with Petitioner two or three times at court on the days of his court

---

[1] Lead counsel mistakenly referred to this witness as Gerald Prim, but the record indicates the name of the witness was in fact Jerrick Prime. For consistency, we will refer to the witness as Jerrick Prime.

- 12 -

appearances. During the visits, lead counsel and Petitioner discussed the facts of the case and the trial.

Lead counsel said that prior to trial, he was aware the State had filed a notice of enhanced punishment and that during court appearances, he and Petitioner discussed the potential sentencing exposure. Lead counsel had reviewed Petitioner's criminal record, including his prior felony convictions, as part of the discovery. Lead counsel said that his "main concern was trying to keep any guns out of his trial." Lead counsel did not recall having a "detailed discussion" with Petitioner about how the firearms charge would have to be served consecutively to the aggravated burglary charge if he were convicted of both offenses, but he stated that "[u]nder normal circumstances," he would have discussed possible mandatory sentencing with his client.

Lead counsel and Petitioner discussed a defense strategy concerning whether Petitioner "could actually kidnap his own children." Lead counsel discussed the damaging evidence with Petitioner, noting that Petitioner's calls to his mother from jail were "devastating" because he made "admissions" during the calls. Lead counsel and Petitioner also discussed the facts underlying the domestic assault allegation and how "that could be also damaging as well to the other allegations."

Lead counsel brought in co-counsel shortly after he was appointed to the case. Co-counsel's role was to perform the cross-examination of Petitioner's children, and lead counsel was to handle the remainder of the case. During trial, information from Centerstone was entered into evidence. Lead counsel explained that after Petitioner kidnapped Ms. Waters and her children, Ms. Waters convinced Petitioner that her oldest daughter had an appointment at Centerstone, and Petitioner, Ms. Waters and the children drove there. When they arrived, Petitioner remained in the car while Ms. Waters and the children went inside the building. Ms. Waters told the people inside the building "that she had been kidnapped and that [the] father of her child was trying to kill them." The State introduced the Centerstone records to establish that the victim had invented the story about an appointment to escape Petitioner. Lead counsel said he "[p]robably" objected to the records being introduced as exhibits but that he could not recall the nature of the objection.

Lead counsel said that he received the discovery from prior counsel and that he did not file his own discovery request. Petitioner told lead counsel that when he saw Ms. Waters speaking with someone inside Centerstone, he went inside the building, "raised up his shirt, showed the people at the front desk that he wasn't armed, made a 360 turn so she could look all around him while he had his shirt up and then he left from Center[s]tone."

Lead counsel agreed that during the recorded jail phone calls, Petitioner's mother referred to Petitioner's having a "stolen gun." Lead counsel objected to the statement and

requested it be redacted from the call, but his objection was overruled. Lead counsel did not have the capability to redact the phone call himself. Lead counsel said he wanted to keep out any evidence of a weapon because Ms. Waters had alleged Petitioner had held a gun on her and her children. Lead counsel acknowledged that on direct appeal, this court ruled that his mother's statement regarding the gun should have been redacted but that the error did not warrant a reversal of Petitioner's convictions.

Lead counsel acknowledged that prior to trial, Petitioner pled guilty to a misdemeanor. Lead counsel and Petitioner discussed whether to enter the plea but ultimately the decision whether to plead was Petitioner's. Petitioner pled guilty to accept blame and establish rapport with the jury, not to keep evidence of that charge from the jury. Lead counsel and co-counsel were able to review the instructions prior to them being read to the jury. Lead counsel did not object to the language in the instructions stating that Petitioner had pled guilty to domestic assault because it did not harm Petitioner's case.

Lead counsel did not see a need for a bill of particulars to be filed because the "case was pretty much straight-forward." On the morning of trial, lead counsel made a motion to continue. Lead counsel acknowledged that the case "was complicated from the standpoint of the kidnapping aspect of it" and that it was the first kidnapping case he tried "[s]o it took [him] a little time to get caught up to speed about it." Lead counsel "found it difficult that a father could kidnap his own kids in a house that they all live in." Lead counsel said that he had not seen any technical defects in the indictment. Lead counsel was removed from the case after trial but before sentencing because Petitioner had filed a complaint against him.

Lead counsel and Petitioner discussed whether Petitioner would testify, and lead counsel advised him not to testify due to his extensive criminal history. However, Petitioner made the ultimate decision whether to testify. Lead counsel said that Ms. Waters was the State's main witness. Accordingly, lead counsel gathered evidence to try to impeach her. Lead counsel stated that the trial was basically "a swearing contest" between Petitioner and Ms. Waters. Without Petitioner's testimony, the evidence consisted of Ms. Waters' testimony, her son's testimony, the Centerstone employees' testimony, and "those devastating jail calls."

Lead counsel did not request any additional lesser-included offense instructions because he thought they were already included in the jury instructions. Lead counsel did not recall discussing whether attempt should have been charged. Lead counsel did not see anything objectionable with the jury instructions. Lead counsel said that the only appealable issues he saw during trial concerned the redaction of the statement regarding the stolen gun from the jail phone call.

On cross-examination, lead counsel said that he thought he was the fifth attorney to represent Petitioner. When lead counsel began representing Petitioner, the trial date had been set, and the pretrial motions had been filed. Lead counsel said the case was "beyond the plea negotiating stage." Lead counsel and Petitioner discussed the witnesses who would testify. Part of Petitioner's defense was to let the jury know he had a key to Ms. Waters' apartment and that he did not "break into" the apartment. Ms. Waters was adamant that Petitioner did not live in the apartment and did not have a key.

Lead counsel said that he did not hire an investigator and that he did not see an investigative report in the file indicating prior counsel had hired an investigator. Nevertheless, lead counsel thought that the defense could show Ms. Waters was not truthful about Petitioner's lack of a key and possession of a gun, which would call into question the remainder of her testimony. Lead counsel advised Petitioner against testifying because of his extensive criminal history and the fear Petitioner could open the door to "numerous domestic issues." Lead counsel had noticed that "every time [Ms. Waters] would bring up a domestic issue," she would allege that Petitioner had a gun regardless of whether he had one. In a jail call, Petitioner's mother spoke to Petitioner about having a "stolen gun." She never said who stole the gun or whose gun it was.

Petitioner did not raise any concerns with lead counsel prior to trial. Instead, Petitioner's "main focus was on having somebody come testify that he lived there and was allowed to be there." Additionally, Petitioner wanted the jury to know that he showed the Centerstone employees that he was not armed after the victim had entered the building and claimed Petitioner "had threatened to kill her and that he had a gun."

Lead counsel did not recall discussing lesser-included offenses with the trial court, but he acknowledged that the trial court usually discussed lesser-included offenses with the parties.

On redirect examination, lead counsel said that he thought Petitioner "did himself in by talking on that jail phone." Lead counsel said that Petitioner had called his mother and the victim and that Petitioner "shouldn't have been making no calls to anyone." Lead counsel stated that the jury "seized on that fact that he was making these calls, making the admissions and that's what got him convicted."

Lead counsel agreed that when he objected to the statement regarding the stolen gun, he argued "that this was the stolen gun from the June incident that was being portrayed on the calls" and that they did not find a gun in Ms. Waters' car at Centerstone.

- 15 -

Prior counsel testified that he represented Petitioner before lead counsel was appointed. When prior counsel was appointed in 2013, approximately 99% of his practice was criminal defense.

Prior counsel said that he filed motions "pertaining to a weapon and some 404[(b)] issues that I was concerned about." Prior counsel agreed that the events underlying counts 1 and 2 "happened on another date." Prior counsel said that he filed a witness list and that either he or his investigator, Tim Mason, had interviewed the witnesses named on the list.

On multiple occasions, prior counsel and Petitioner discussed the potential sentences Petitioner could receive if he were convicted. They also discussed the possibility of Petitioner testifying at trial, the risk he could be impeached by the State, and possible defenses.

During prior counsel's representation, the State made a plea offer involving a twelve-year sentence at 100%, but prior counsel could not recall on which offense. Prior counsel tried to negotiate a sentence of eight years with a percentage less than 85%, but no agreement could be reached. At that point, prior counsel had the case set for trial. After prior counsel was relieved from representation, he gave the case file and the discovery to lead counsel. Prior counsel did not recall having any conversations with co-counsel.

Prior counsel recalled that a superseding indictment was filed against Petitioner. Prior counsel and Petitioner discussed the differences between the original indictment and the superseding indictment. After the superseding indictment was filed, prior counsel received some supplemental discovery.

On cross-examination, prior counsel said that he met with Petitioner on multiple occasions and discussed "the case, defenses, [and] possible witnesses." Prior counsel determined that some of the witnesses suggested by Petitioner would not make good witnesses at trial. Prior counsel warned Petitioner that if he testified, the State would be able to perform "a very effective cross-examination," especially considering Petitioner's extensive criminal history, the statements made by Petitioner and others during the jail phone calls, and the statements Petitioner made in the letters to Ms. Waters. Prior counsel thought the State wanted Petitioner to testify because his testimony would help their case.

Prior counsel agreed that pretrial, he filed multiple motions in limine and a motion to sever which resulted in counts 1 and 2 being severed. Prior counsel thought the trial court and the parties discussed the Rule 404(b) issues, but prior counsel did not recall the nature of the discussion or the trial court's ruling. On the morning of jury selection, prior counsel had to withdraw from representation.

Sergeant Wilfred Klotzback with the evidence storage section of the MNPD testified that records relating "to a 1911 handgun under Incident No. 2011-048378" reflected that the gun was brought into the property room on June 20, 2011. The gun was returned to Hendersonville Police Detective Neal Harris on June 21, 2011. Sergeant Klotzback had no personal knowledge about the gun.

Brenda Martin testified that Petitioner was her nephew. Ms. Martin knew that in the summer of 2011, Petitioner was living with Ms. Waters. Ms. Martin knew of Petitioner's living arrangements because she had to go to the residence to "remove him from [Ms. Waters'] house." Ms. Martin said that at some point, she picked up Petitioner's keys from the sheriff's department. Prior to the post-conviction hearing, Ms. Martin gave the keys to post-conviction counsel.

On cross-examination, Ms. Martin said that she moved Petitioner from Ms. Waters' house because the victim "kept calling me to try to get him to leave, and he wouldn't leave." Ms. Martin was never present when Petitioner assaulted the victim. Ms. Martin had seen Petitioner with a gun but had never seen him with a gun around the victim. Ms. Martin could not recall when she retrieved Petitioner's keys from the Davidson County Sheriff's Department, but she knew it had been after Petitioner was sent to the penitentiary.

On redirect examination, Ms. Martin said that until she gave the keys to post-conviction counsel, she kept them in her car. Ms. Martin did not know "where the keys go to because I haven't used the keys."

Petitioner testified that he had been incarcerated for ten years and that his sentence was seventy years at 100%. Petitioner said that after his direct appeal, this court "took the hundred percent off the gun charge and reduced it to forty-five percent." Petitioner recalled that prior counsel filed a motion to sever and discussed the motion with Petitioner. Petitioner recalled discussing trial strategy with prior counsel on the original indictment. However, after Petitioner "was hit with a superseding indictment . . . where [the State] added some more counts and . . . broadened some counts," Petitioner and prior counsel did not discuss strategy regarding the superseding indictment.

Petitioner and prior counsel discussed possible witnesses, and Petitioner gave prior counsel the names of witnesses. Thereafter, Petitioner and prior counsel "had a breakdown in communication because [Petitioner] felt like [prior counsel] was conspiring with the District Attorney." Petitioner explained that the prosecutor had offered "twelve at eighty-five" because she "knew the case was some nonsense." The prosecutor also said that Petitioner's previous attorneys "had been getting [him] off," that Petitioner "had been getting away with murder," and that she "wanted to see [Petitioner] do some time." Petitioner told prior counsel to inform the trial court that the prosecutor "was being

vindictive in [his] prosecution" because she had threatened to supersede his indictment if he did not accept the plea offer. Petitioner told prior counsel that "y'all white folks sending brothers out at an all-time high right now," prior counsel "got offended," and Petitioner and prior counsel "fell out." Subsequently, prior counsel was relieved as counsel, and lead counsel was appointed.

Petitioner said that prior counsel visited him in jail before the superseding indictment was returned but not after. Petitioner said that if prior counsel discussed potential sentencing exposure with him, "it was on the old indictment," which charged Petitioner with Class B felonies instead of the Class A felonies that were charged in the superseding indictment.

Once lead counsel was appointed, he and Petitioner discussed possible witnesses, including his aunt, Ms. Martin; his cousin, Prime; his uncle, Dobson; his federal probation officer, Troy Lanahan; and "the doctor" with whom his son had an appointment. Petitioner told lead counsel that since he began his relationship with Ms. Waters, Ms. Martin and Ms. Waters also had a "beautiful relationship" and that Ms. Martin would not lie for him "because she loves [Ms. Waters] just like she loves me." Petitioner told lead counsel that Ms. Martin would "tell [him] the truth, that I lived there and how I – I acted a fool and she had to come get me." Petitioner stated that the keys Ms. Martin got from the police had "several house keys," including keys to Ms. Waters' house. Petitioner said that "the court officer, went and got the keys for me, but I don't think that [lead counsel] investigated or he wanted them." Petitioner last saw the keys when they came out of his pocket on August 27, 2011.

Petitioner said that before trial, he wrote prior counsel a letter saying that they needed to review the phone calls because Petitioner "felt the State was using false evidence" against him. Petitioner explained that "the stolen gun that the call is referring to had been in the property room prior to this incident. It's been in the property room since June 18th, 2011, this stolen gun that me and my momma was talking about on the phone." The gun was a .45 caliber Kimber 1911. Neither lead counsel nor co-counsel investigated the property room. Petitioner said that when he brought it to lead counsel's attention, "he was so incompetent that he subpoenaed the wrong witness," who was someone from "Metro."

Petitioner said that he was not informed of any trial strategies or possible defenses by lead counsel. In fact, the only thing lead counsel told him "was that he was not ready, that the case was too complicated for him and . . . he was fixing to get a continuance." Lead counsel conveyed that information the morning of trial. During trial, Petitioner asked if he could testify, and lead counsel responded that he had no questions to ask Petitioner. Petitioner did not recall lead counsel or co-counsel discussing evidence that could possibly

impeach Petitioner if he testified. Petitioner said that lead counsel and co-counsel did not review anything with him, did not tell him the strengths or weaknesses of the case, and did not tell him what the State needed to prove to establish Petitioner's guilt. Petitioner and lead counsel did not discuss lead counsel filing any pretrial motions. Petitioner did not know whether lead counsel talked to any witnesses, but he knew prior counsel or the investigator spoke to witnesses. Petitioner asserted, however, that the witnesses to whom the investigator or prior counsel spoke were "on the previous indictment."

Petitioner said that no one explained to him that if he were convicted at trial, the firearms charge would be mandatorily consecutive to the aggravated burglary charge. Petitioner said that he had not known the appointment list from Centerstone was going to be an exhibit at trial. Petitioner said that lead counsel objected to the list at trial, stating that he had never seen it, but that the State responded it was part of supplemental discovery. Petitioner said that he received discovery on "the old indictment" but not on the superseding indictment.

Petitioner said that Ms. Waters alleged she went to Centerstone without an appointment to escape Petitioner. However, Petitioner said that they were going to Centerstone without an appointment to pick up medication for his stepdaughter. Petitioner explained that he raised his shirt when he came in because Ms. Waters said he had a gun.

Before trial, prior counsel allowed Petitioner to read transcripts of the jail calls, including the one with Petitioner's mother. Petitioner said that his mother witnessed the June 18, 2011 altercation but did not witness the July 2011 altercation. He acknowledged, however, that his mother did not mention the June altercation during the phone call. Petitioner agreed that lead counsel objected to the admission of Petitioner's mother's statement during the phone call regarding the gun.

Petitioner said that prior counsel advised him of a plea offer before the superseding indictment but that lead counsel did not advise him of any offers after the superseding indictment. After the verdict was rendered, lead counsel advised Petitioner "there was a fifteen at a hundred on the table." Petitioner said that he would have accepted the offer because lead counsel had said he was not prepared for trial. Petitioner said, "I felt like he was handicapped to force me to go to trial. . . . So If he would have broke down and told me that I'm facing seventy years if I get found guilty based on me taking fifteen years on this plea, yeah, I would have took it."

Petitioner acknowledged that he pled guilty to a misdemeanor prior to trial. He explained that he wanted to accept responsibility for his actions. He stated that if he had been advised that he was incriminating himself and that it would be used against him at trial, he would not have entered the guilty plea. Petitioner said that he thought the trial

court should have advised him that he was incriminating himself by entering the guilty plea. Petitioner did not know the jury was supposed to learn of the guilty plea because "[d]idn't nobody tell me nothing."

Petitioner said that he thought a bill of particulars should have been filed because "the indictment never alleged the three magic words, the threat when concerning the kidnappings of my kids." Petitioner also noted that the prosecutor told co-counsel she should have filed for a bill of particulars when co-counsel "brought up the gun issues and the dangers" in the motion for new trial. Finally, Petitioner said that counsel should have filed for a bill of particulars because his trial was based on "three indictments."

Lead counsel did not make any motions or statements to the trial court about charges on lesser-included offenses. Petitioner did not know anything about lesser-included offenses at the time of trial.

Petitioner contended that lead counsel should have objected to the dismissal of the aggravated assault charge. Petitioner alleged that by "dismissing the aggravated assault, [the State] was denying [Petitioner] *White* instructions and due process." Petitioner stated that the prosecutor dismissed the aggravated assault charge because she thought it would raise a *White* issue. Petitioner thought by having the aggravated assault charge dismissed, he lost one of his defense options. He explained that the jury should have decided whether the "aggravated assault was incidental to the kidnapping instead of the burglary charge."

Petitioner said that after lead counsel was relieved as counsel, co-counsel remained as his attorney. Co-counsel advised Petitioner that "she didn't know how to do appeals" but that she wanted to preserve Petitioner's rights because she thought lead counsel had "abandoned [him] at a critical stage." Petitioner was "okay" with co-counsel handling his motion for new trial. Petitioner said that he did not know what co-counsel's role in the trial was supposed to be and that she had joined the defense in a limited capacity. After co-counsel was relieved, appellate counsel handled the direct appeal. Appellate counsel advised Petitioner that lead counsel should not have been relieved "because the Supreme Court ruled that he took an appointment, he should have did it all the way through." Appellate counsel told Petitioner that his representation was "handicapped" on direct appeal because he had not represented Petitioner at trial or on the motion for new trial. Appellate counsel advised Petitioner that there were many things lead counsel should have done that he did not do but that appellate counsel would not raise those issues on direct appeal or else they would be waived on post-conviction.

On cross-examination, Petitioner acknowledged that his initial attorney filed a motion for discovery and that the attorney provided Petitioner with a copy of the motion for discovery and a copy of the indictment. Petitioner asked for that attorney to be relieved

as counsel because he was "racist." Thereafter, prior counsel was appointed. Petitioner agreed that prior counsel was polite, hired an investigator, and discussed "the old indictment" with Petitioner. Prior counsel explained that on the "old indictment," Petitioner was charged with aggravated kidnapping, asked Petitioner for the names of any pertinent witnesses, and talked with the witnesses. Petitioner asked for prior counsel to be relieved from representation because he refused to tell the trial court that the prosecutor threatened to seek a superseding indictment if Petitioner refused to accept a twelve-year plea agreement because a different attorney had represented Petitioner and had been "getting [him] off." Petitioner felt that prior counsel was "conspiring" with the State.

Petitioner said that he thought post-conviction counsel was going to call his uncle, Steve Dobson, to testify that the victim picked Petitioner up from Dobson's house on the night Petitioner "allegedly supposed to kick in the door and do all this." Petitioner also wanted post-conviction counsel to call his federal probation officer, Troy Lanahan. Petitioner maintained that the jury knew about Petitioner's prior convictions because they listened to his jail phone calls; therefore, the jury knew he had been on federal probation. Petitioner said, "Why not tell the truth, let the truth come out." Petitioner stated that Lanahan would have testified that "while on federal paper," Petitioner lived at the victim's residence and that Lanahan had visited Petitioner at the victim's residence.

Petitioner acknowledged that the current district attorney had represented him as defense counsel in previous cases in which Petitioner had pled guilty to felony offenses and received a sentence. The last time the district attorney was his defense counsel was in 2003. Petitioner acknowledged that he was in custody the entire time his charges were pending. During his confinement, prior counsel and the prosecutor approached him with the twelve-year plea offer. Petitioner rejected the offer and told prior counsel, "Go get me an eight."

Petitioner said that on either August 27, 30, or 31, 2011, he was at Ms. Waters' apartment because he "had never left." Petitioner said that Ms. Waters had keys made for him at Walmart. On the August date, Ms. Waters left, saying that she was going to put in a job application. Instead, Ms. Waters called the police so they could serve Petitioner with a warrant because he was at her house. The warrant was served a month after the kidnapping incident.

Petitioner said that he did not talk to lead counsel or ask him to get phone records. Petitioner stated that lead counsel told Petitioner that he was not prepared for trial. Petitioner claimed that lead counsel "ain't had no sit-down with me, investigator or prepared no case for me." Petitioner thought lead counsel should have interviewed him so Petitioner could have "walked him through it" and told lead counsel the facts and circumstances of the case. Petitioner said:

I could have told him what my testimony was going to be as far as the house situation with all the stealing and how [Ms. Waters] say that she went for this job interview. No, she caught me on Facebook with Kelly, and send me to jail and kept the money in the house.

. . . .

[Lead counsel] didn't . . . he didn't interview my Facebook page. If he interviewed my Facebook page, it would have shown me in the house with the kids and everything would have came out.

A lot of these things that I feel like if he sit down – the keys. He could have sent an investigator to the apartment complex to try the keys. None of this was ever done.

Petitioner acknowledged that he did not tell any of his facts, such as the keys and his Facebook page, to prior counsel. Petitioner explained that he "lost confidence in both of them attorneys." Petitioner said that he told one of his attorneys that Ms. Waters had a criminal history, then the State started suppressing evidence and denying Petitioner *Brady* material. Petitioner said, "They expunged her criminal record prior to trial after I done told the lawyer she got records." Petitioner stated that Ms. Waters told his niece "that they expunged her record." Petitioner said that Ms. Waters was never asked about her prior convictions at trial.

Petitioner acknowledged that in one of the jail phone calls, his mother said "what you expect with a stolen gun and you wouldn't let them go either." Petitioner maintained those statements were "false evidence" and were "highly prejudic[ial]" for the jury to hear because they had nothing to do with the charges for which he was on trial. Issues regarding the statements were raised on direct appeal. Petitioner said he was raising the issue on post-conviction because his "statutory right was violated" because lead counsel should have filed a motion to redact the phone call.

Petitioner asserted that he did not file a complaint with the Board of Professional Responsibility against lead counsel but acknowledged that he told lead counsel that he would file a complaint against him. Petitioner explained that after the trial court denied lead counsel's motion for a continuance, he told lead counsel to recuse himself because the trial court had told Petitioner he could not fire any more attorneys and that if Petitioner fired lead counsel, the trial court would make Petitioner represent himself. Lead counsel refused to recuse himself.

- 22 -

Petitioner said that if lead counsel had advised him of the offer of twelve years at one hundred percent after the superseding indictment was returned, he would have accepted it even though he rejected the offer when prior counsel advised him of the offer.

The post-conviction court denied post-conviction relief, and Petitioner appeals.

**Analysis**

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697. Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). The factual findings of the post-conviction court are binding on an appellate court unless the evidence in the record preponderates against those findings. *Dellinger*, 279 S.W.3d at 294. The post-conviction court's application of law to its factual findings is reviewed de novo with no presumption of correctness. *Calvert*, 342 S.W.3d at 485. A claim of ineffective assistance of counsel presents a mixed question of law and fact that is subject to de novo review with no presumption of correctness. *Id.*; *Dellinger*, 279 S.W.3d at 294; *Pylant v. State*, 263 S.W.3d 854, 867 (Tenn. 2008).

Review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006). Deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness

under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome" of the trial. *Id.* The stronger the proof of guilt presented at trial, the more difficult it is to prove the prejudice prong of *Strickland*. When proof of guilt is overwhelming, proving prejudice is exceedingly difficult. *See Proctor v. State*, 868 S.W.2d 669, 673 (Tenn. Crim. App. 1992); *Randy Bray v. State*, No. M2011-00665-CCA-R3-PC, 2012 WL 1895948, at *6 (Tenn. Crim. App. May 23, 2012) (finding that, in light of overwhelming evidence, petitioner could not demonstrate prejudice); *Raymond E. McNeil v. State*, No. M2010-00671-CCA-R3-PC, 2011 WL 704452, at *6 (Tenn. Crim. App. Mar. 1, 2011) (finding that overwhelming evidence of guilt precluded showing of prejudice from admission of item of evidence at trial).

At the post-conviction hearing, Petitioner raised, and the post-conviction court addressed thirteen claims of ineffective assistance of counsel raised by Petitioner. On appeal, Petitioner raises eight claims of ineffective assistance of counsel.

Petitioner contends that lead counsel failed to investigate the facts of the case or interview witnesses. As support for this contention, Petitioner cites lead counsel's telling co-counsel on the morning of trial that he was not prepared and would get a continuance. Petitioner further notes that lead counsel should have had Ms. Martin testify that she had gotten Petitioner's keys, including the keys to Ms. Waters' apartment, from the sheriff's department. The State responds that lead counsel investigated the witnesses by reviewing the written statements of the State's witnesses, some of which were compiled by prior counsel and his investigator. The State further responds that Petitioner did not note any favorable evidence additional investigation would have uncovered.

The post-conviction court concluded that although Petitioner claimed Ms. Martin should have been called as a witness, Ms. Martin testified that she knew Petitioner to have a gun and that she had needed to remove Petitioner from Ms. Waters' residence "after he refused to leave on his own accord." The post-conviction court concluded that Ms. Martin's testimony "would likely [have] harm[ed]" Petitioner's case and that lead counsel was not deficient for not calling her. The post-conviction court also noted that lead counsel had made strategic decisions not to call other witnesses suggested by Petitioner because their testimony would have been detrimental to Petitioner's case. The post-conviction court accredited the testimony of lead counsel who said that he reviewed the discovery, including the statements of the State's witnesses and the photographic evidence, and conferred with prior counsel. Finally, the post-conviction court found that Petitioner failed to establish any evidence that further investigation could have uncovered. Although the

post-conviction court noted that Ms. Martin obtained Petitioner's keys, which included a key to Ms. Waters' apartment, the court also noted that Petitioner did not live in Ms. Waters' apartment nor did he have an open invitation to come to her apartment. The record does not preponderate against the findings of the post-conviction court. The Petitioner has failed to establish that lead counsel was deficient or that Petitioner was prejudiced by any alleged deficiency. He is not entitled to relief in this regard.

Petitioner contends that lead counsel failed to "prepare cross examination of State's proof." Specifically, Petitioner contends that lead counsel failed to investigate Centerstone's appointment lists to discover that "there was no scheduled appointment on July 22, 2011." Moreover, Petitioner testified that there were reasons for the family to make an unscheduled visit to Centerstone. The State responds that although lead counsel had not seen the Centerstone records that were introduced at trial to corroborate the victim's testimony that none of her family members had an appointment at the facility that day, the records did not create a new argument or prosecutorial strategy.

The post-conviction court found that lead counsel did not see the Centerstone appointment list prior to trial. The post-conviction court noted that even if such representation was deficient, Petitioner failed to prove that lead counsel's actions resulted in prejudice. The post-conviction court said "that even if the Petitioner could have shown a legitimate reason for being at Centerstone that day, it would not explain why he entered the building a few minutes after the family, conspicuously lifted his shirt to show that he was unarmed, and then disappeared before the police arrived." Moreover, we note that lead counsel testified that Petitioner never advised him that the family had a legitimate reason for making an unscheduled visit to Centerstone. Instead, Petitioner "told [lead counsel] he just wanted the people at Center[s]tone to see that he did not have a gun." The evidence does not preponderate against the findings of the post-conviction court. The Petitioner has failed to establish that he was prejudiced by any alleged deficiency. He is not entitled to relief in this regard.

Petitioner contends that lead counsel failed to file pretrial motions. Specifically, Petitioner claims that lead counsel should have filed a motion to redact statements by Petitioner's mother made during jail phone calls referring to a gun. Petitioner alleges that the references to the gun concerned "a previous incident where this firearm was collected in the June 18, 2011 incident" but that the context was not explained to the jury. The State responds that lead counsel properly objected to the admission of the unredacted jail phone calls on the grounds of relevance and undue prejudice. The State further responds that Petitioner failed to establish prejudice, noting that this court found the failure to redact the phone call to be harmless error.

The post-conviction court found that prior counsel filed the proper pretrial motions relating to the jail phone calls. Lead counsel contemporaneously objected to the phone calls and requested that the reference to the "stolen firearm" be redacted. Accordingly, the post-conviction court concluded that lead counsel was not deficient. The record does not preponderate against the findings of the post-conviction court. Further, we note that on direct appeal, this court ruled that the trial court erred by refusing to redact the jail phone call but held that the error was harmless because

> [t]he record reflects that Waters and K.W. both testified that [Petitioner] had a gun on July 22. Moreover, when [Petitioner] entered Centerstone, he conspicuously lifted his shirt and hands, without being prompted, to show that he did not bring any weapons into the facility. Finally, the defense strategically chose to allow the jury to hear and see highly prejudicial evidence regarding [the Petitioner's] use of violence against Waters on July 23, despite his pleading guilty to domestic assault before trial. Thus, when considering the whole record, we conclude that the trial court's error did not affect the outcome of the trial.

*Mark Brian Dobson*, 2016 WL 7212574, at *10 (footnote omitted). Thus, Petitioner suffered no prejudice as a result of the alleged deficiency. Petitioner is not entitled to relief.

Petitioner contends that lead counsel failed to "preserve a defense pursuant to *State v. White*, 382 S.W.3d 559 (Tenn. 2012)." Petitioner contends that the State initially charged Petitioner with one count of aggravated assault but dismissed that count prior to trial because the prosecutor was concerned about a potential *White* issue. Petitioner contends that the State dismissed the aggravated assault charge to deprive Petitioner "of a defense under *White*" to the charges of the especially aggravated kidnapping of Ms. Waters and her children. The State responds that lead counsel properly preserved defenses. The State observes that regardless, counsel of record would have been "forced to weigh[] the preservation of a potential *White* defense against dismissal of a serious criminal charge."

We note that *White* addresses whether a robbery, rape, or assault conviction, accompanied by a separate kidnapping conviction, gives rise to due process concerns. *State v. Alston*, 465 S.W.3d 555, 561 (Tenn. 2015). In *White*, our supreme court held that the due process concerns were satisfied when a jury was instructed that they must determine "whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." *White*, 362 S.W.3d at 578. As such, *White* concerns the necessity for a jury instruction and whether the evidence was sufficient to satisfy the *White* requirements; it does not concern a defense.

- 26 -

Moreover, as the post-conviction court noted, the State has "broad discretion over the control of criminal prosecutions." *State v. Harris*, 33 S.W.3d 767, 771 (Tenn. 2000). Accordingly, it was within the State's discretion to decide on which counts to prosecute Petitioner. We agree with the post-conviction court that "it is not unreasonable that [lead] counsel would make no objection to the State's decision to dismiss a count against [Petitioner]." The evidence does not preponderate against the findings of the post-conviction court. The Petitioner has failed to establish that lead counsel was deficient or that Petitioner was prejudiced by any alleged deficiency. He is not entitled to relief in this regard.

Petitioner contends that lead counsel was ineffective by failing to discuss mandatory consecutive sentencing with him. The State responds that lead counsel was not ineffective in discussing sentencing with Petitioner. Initially, the State contends that this claim is waived because Petitioner failed to raise the issue in any of his post-conviction petitions, Petitioner failed to make a "formal argument" on this claim during the post-conviction hearing, and the trial court failed to make a legal ruling regarding this claim. Regardless, the State contends that Petitioner failed to show prejudice.

We have examined Petitioner's post-conviction petitions and can find no mention of a complaint regarding lead counsel's failure to discuss mandatory consecutive sentencing with him. During the post-conviction hearing, Petitioner and his attorney made a few brief mentions of consecutive sentencing but failed to make any arguments concerning this issue. "[I]ssues not addressed in the post-conviction court will generally not be addressed on appeal." *Holland v. State*, 610 S.W.3d 450, 458 (Tenn. 2020) (citations and internal quotation marks omitted). Generally, this court "may only consider issues that were not formally raised in the post-conviction petition if the issue was argued at the post-conviction hearing and decided by the post-conviction court without objection." *Id.* The post-conviction court did not address this issue in its order denying post-conviction relief. We conclude that this issue has been waived. *Id.*

Petitioner contends that lead counsel was ineffective by advising him to plead guilty "to a single count during the trial" and by failing to inform Petitioner of the consequences of his plea. Petitioner explains that he was indicted for and pled guilty to a misdemeanor domestic assault that occurred on July 23, 2011, the day after the majority of the more serious crimes occurred on July 22, 2011. Petitioner maintains that the evidence of the domestic assault "was extremely prejudicial, and served no probative value to the case" and instead presented negative character evidence. The State responds that lead counsel advised Petitioner to plead guilty to domestic assault in order to establish credibility with the jury by showing he was willing to admit when he had done something wrong.

Generally, a guilty plea must be a "voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). To establish ineffective assistance of counsel in the context of a guilty plea, "the petitioner must show 'prejudice' by demonstrating that, but for counsel's errors, he would not have pleaded guilty but would have insisted upon going to trial." *Hicks v. State*, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998); *see also Hill v. Lockhart*, 474 U.S. 52, 59 (1985). The post-conviction court found that Petitioner testified that he pled guilty because he wanted to take responsibility and that he pled guilty whenever he was guilty. The post-conviction court accredited lead counsel's testimony that he advised Petitioner to plead guilty to establish credibility with the jury. The post-conviction court noted that "[d]uring closing arguments, defense counsel argued that [Petitioner] pled guilty to the July 23 offense because he 'accepted his responsibility for his wrongdoing. . . . [B]ut he vehemently and consistently denied kidnapping Ms. Waters or his children or any of the children consistently.'" *Mark Brian Dobson*, 2016 WL 7212574, at *10 n.1. "In addressing attorney performance, courts must be mindful not to second guess tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by 20–20 hindsight.'" *Cauthern v. State*, 145 S.W.3d 571, 600 (Tenn. Crim. App. 2004) (citations and internal quotation marks omitted). The post-conviction court also found that lead counsel's advice to plead guilty was reasonable in light of the substantial evidence against Petitioner on the domestic assault charge. Based upon the foregoing, the post-conviction court concluded that Petitioner failed to establish that lead counsel was deficient. The record does not preponderate against the findings of the post-conviction court. The Petitioner has failed to establish that lead counsel was deficient or that Petitioner was prejudiced by any alleged deficiency. He is not entitled to relief in this regard.

Petitioner contends that co-counsel was ineffective by failing to preserve issues for appeal. Petitioner maintains that co-counsel represented Petitioner at the motion for new trial solely to preserve Petitioner's right to appeal. He argues that while she was well-meaning, her motion for new trial "was not based on an informed investigation of the facts relevant to the Motion for New Trial and Direct Appeal . . . . The issues presented on Direct Appeal would have vastly improved with a proper investigation of the jail call issue, for example." In other words, Petitioner asserts that co-counsel ineffectively preserved his appellate issues at the motion for new trial. The State responds that Petitioner's appellate issues were properly preserved. The State notes that co-counsel raised ten issues in the motion for new trial and amended motion for new trial. The State further notes that Petitioner does not specify any issues that co-counsel should have preserved but did not preserve. We agree with the State. Petitioner fails to identify which issues should have been raised and makes no argument on how co-counsel's failure was deficient and prejudicial. See e.g., *Carpenter v. State*, 1236 S.W.3d 879 (Tenn. 2004). This issue is therefore waived. See Tenn. R. App. P. 27(a)(7); Tenn. Crim. App. R. 10(b).

The post-conviction court stated that "Petitioner argues that his Direct Appeal was ineffective because [lead] counsel failed to make proper and timely objections and motions." However, on appeal, Petitioner challenges the efficacy of co-counsel. "A party is bound by the evidentiary theory argued to the post-conviction court and may not change or add theories on appeal. We are not required to address issues raised for the first time on appeal." *Joseph Sanford McNair, Jr. v. State*, No. E2021-00219-CCA-R3-PC, 2022 WL 2115087, at *8 (Tenn. Crim. App. June 13, 2022) (citations omitted). This issue is waived.

Finally, Petitioner contends that he is entitled to post-conviction relief due to the cumulative effect of the errors of counsel. The State responds that Petitioner was not able to establish cumulative error because he was not able to show more than one error occurred. We agree with the State. *State v. Hester*, 324S.W.3d 1, 76 (Tenn. 2010). Petitioner is not entitled to relief in this regard.

## Conclusion

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
JILL BARTEE AYERS, JUDGE

- 29 -